371 So.2d 838 (1978)
Carol POLMAN, wife of/and Raymond A. Schwankhart
v.
MOHASCO CORP., Raymond C. Bennet, and Employers Ins. of Wassau.
No. 9628.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 1978.
On Rehearing June 25, 1979.
Writ Refused June 15, 1979.
*839 Sutterfield & Vickery, James R. Sutterfield, New Orleans, for plaintiffs-appellees.
Wood Brown, III, Trial Atty., New Orleans, for defendants-appellants.
Before SAMUEL, LEMMON and GARRISON, JJ.
GARRISON, Judge.
On May 27, 1975 a collision occurred between a Toyota driven by Carol Polman Schwankhart and a van driven by Raymond C. Bennet, an employer of Weiners Inc. The trial court found that the defendant driver was "plainly" negligent in backing into plaintiff. He also found no credible evidence to support a finding of contributory negligence on plaintiff's part. We affirm.
The record indicates that the truck missed its turn and stopped in the roadway. Plaintiff then stopped behind the truck. At that point, the truck suddenly backed into the plaintiff's vehicle.
The trial court awarded plaintiff $525,000.00 in general damages: $50,000 pain and suffering to date; $350,000.00 future pain and suffering; and $125,000.00 loss of future earning capacity. He awarded $21,866.19 in special damages to the husband. The trial court termed Mrs. Schwankhart's injuries as "devastating." Defendant has appealed.
Before this accident Mrs. Schwankhart had experienced severe problems with her neck. In March of 1974 she had had surgery to fuse discs at the C5-C6 and C6-C7 levels. Her neurosurgeon, Dr. Llewellyn discharged her on May 6, 1974.
The day after this accident she consulted Dr. Llewellyn, who examined her and diagnosed her condition as a cervical sprain. He recommended moist heat, rest and prescribed pain pills and muscle relaxants. She was seen by Dr. Llewellyn and his associates on June 17, 1975 and July 21, 1975. On both of these occasions she was found to be improving although still having complaints. On November 25, 1975 it was found that the plaintiff had improved to a point where she could be discharged to continue conservative treatment of moist heat herself.
She was seen by Dr. Ruel, her orthopedic surgeon on June 30, 1975. His examination showed she could hold her head erect without deviation or rotation. There was a decrease of extension and tilting to the right and left. The neurological examination was normal. She also had normal strength and no muscle spasm. The x-rays showed a solid fusion between C5 and C6 and C6 and C7. There were no abnormalities. He diagnosed a cervical sprain and recommended heat and valium. Dr. Ruel again saw the plaintiff on December 23, 1975. Again the examination was normal. There was no change in plaintiff's range of *840 motion of the cervical spine. No other active treatment was necessary. He did not feel this injury would have any long term effect.
On October 15, 1975 plaintiff was seen by Dr. Eugene Dabezies, an orthopedic surgeon. It was his opinion that she had sustained a cervical sprain which had not disturbed the interbody fusion. She was not a candidate for surgery, nor did she require hospitalization. He did not think she had a cervical disc problem.
All of the doctors who saw Mrs. Schwankhart through 1975 agree she was doing fine, had not disturbed the fusion and did not require hospitalization. As of December 1, 1975 they felt she was able to work. (And indeed she had worked from September 75 through March 1976 for the Chalmette Chiropractic Clinic). However six weeks later her condition had changed considerably. On February 5, 1976 she returned to Dr. Llewellyn "markedly uncomfortable." He informed her that it was necessary for her to be hospitalized for tests and that further surgery might be necessary. On March 12, 1976 she underwent diskogram studies which indicated she had torn joints at the C3-C4 and C4-C5 levels. These were fused during an operation on March 19, 1976.
The plaintiff progressed satisfactorily until October 21, 1976 when active treatment was felt to be necessary. On January 3, 1977 she had not continued to improve. She was markedly uncomfortable with home therapy and inpatient treatment was necessary. She was rehospitalized on January 9, 1977. X-rays indicated a failure of the C3-C4 fusion and a possible failure at C6-C7. Tomograms were taken on January 10 which showed pseudoarthrosis (failed fusions) at these levels, but the symptoms indicated that the failure was at C3-C4.
On January 20, plaintiff underwent another operation refusing the C3-C4 disc. C6-C7 was examined and found to be immobile. Dr. Llewellyn was pleased with her progress one year post operative progress. She was required to wear a hard collar for the year but he is hopeful that eventually she can be out of the collar on a permanent basis. Dr. Dabazies estimated the plaintiff has suffered a 40% anatomical disability of the body, while Dr. Llewellyn opined that she is totally and permanently disabled for work outside of the house.
The record indicates that although plaintiff's condition improved immediately after the accident, the subsequent deterioration could be attributed to the accident. Dr. Llewellyn characterized her condition at the March, 1976 examination as "representing a failure of conservative therapy" and the doctors generally agreed that it is possible for a patient with this condition to be doing well, then have her condition rapidly deteriorate. They also conceded a patient with a ruptured disc does not necessarily exhibit muscle spasm.
Plaintiff bears the burden of adequately proving a causal relationship between the accident and the injuries complained of. Wyble v. St. Paul Fire & Marine Ins. Co., 316 So.2d 819 (La.App. 3rd Cir. 1975). However, the test is whether plaintiff has shown through medical testimony that more probably than not the subsequent operations were necessitated by trauma suffered in the accident. Hull v. North American Van Lines, 343 So.2d 216 (La.App. 1st Cir. 1977). Dr. Dabezies stated that it is "not highly unlikely" for this patient's condition to deteriorate to the point where surgery was necessary, although she "initially seemed to do well" after the accident, and the treating physicians opined that there was a failure of conservative therapy following an accident which reinjured the back. Therefore, the medical evidence supports the trial court's conclusion that the May, 1975 collision was a cause of the subsequent surgical procedures.
As to the awards for pain and suffering, the trial judge who had the opportunity to view the plaintiff on the stand and to evaluate the impressive lay testimony of the torture of her daily existence, as well as the medical evidence, concluded "(s)he will never again work or live anything remotely approaching a normal life" and (h)er remaining 43 years will be spent in substantial *841 pain."[1] Furthermore, there was considerable evidence that she had been active in camping, boating, sewing, art classes, and numerous other activities with her husband and her two young children prior to this accident and could no longer participate in any of these activities.
The trial court estimated pain and suffering in the two years between the accident and the trial at $50,000.00 and also awarded her an additional $1,000.00 per month for pain and suffering over the remainder of her life expectancy; with the total sum discounted to present day value of $350,000.00. While these awards are generous, we cannot say that the trial court abused its discretion in view of the evidence outlined above. Coco v. Winston Industries, 341 So.2d 332 (La.1976).
As to the $125,000.00 award for impairment of earning capacity, plaintiff was employed from the time of her high school graduation in 1962 until she began having children in 1966. She resumed work in 1975 when her youngest child entered school and worked through March, 1976, when the second surgery became necessary. At the time she left employment she was earning $400.00 per month (the same salary she was earning in 1966) in a clerical position and had applied for a higher paying position with reasonable expectation of obtaining such a job. When she entered the hospital for testing prior to the March, 1976 surgery, she expected to return to work.
Mrs. Schwankhart was evaluated by Dr. Davis, a psychologist, who testified at the trial. From his testimony and his review of Dr. Llewellyn's limitation of her activity, he concluded that she would be excluded from all of the occupations for which she was trained or qualified.
Dr. Davis also stated plaintiff was suffering from depression, anxiety, and confusion of thinking. Defendant objected to the introduction of the psychologist's testimony on the basis of R.S. 37:1284, which prohibits one who is not a licensed physician from testifying in court as a medical or surgical expert. The trial judge properly admitted the testimony. He was aware that the testimony was not that of a psychiatrist. However, a psychologist is capable of diagnosing and treating depression. It was within the province of the trial court to determine the weight to be given to this testimony. His decision was not manifestly erroneous.[2]
Finally, we agree with the trial court's award of $125,000.00 to Mrs. Schwankhart for loss of future earning capacity as her separate property.[3]
An expert in actuarial science calculated the amount which could be placed in an interest bearing fund at time of trial and which (with allowances for salary growth) would yield a fixed amount per month until the fund would be exhausted at the end of 27.7 years (which was plaintiff's work life expectancy). One of the calculations, based on a salary of $6,000.00 per year and a 2% differential between the rate of interest and the rate of wage growth, yielded the sum of $127,000.00. The trial court apparently used this figure. Noting that such awards cannot be calculated with *842 mathematical certainty and involve numerous considerations, we find no abuse of discretion.
For the foregoing reasoning the judgment of the trial court is affirmed.
AFFIRMED.
SAMUEL, J., dissents and assigns reasons.
SAMUEL, Judge, dissenting.
I feel that the award of $525,000 to the plaintiff-wife should be materially reduced in the following respects:
1) The $50,000 award for pain and suffering "to date" (from the time of the accident to the time of trial, a period of two years) is excessive, especially when compared with the $350,000 award for future pain and suffering. The award for future pain and suffering is based on a calculation of $1,000 per month during Mrs. Schwankhart's life expectancy of 43 years. But the award of $50,000 for the two year period following the accident is based on more than double the $1,000 per month figure, despite the fact that for the greater part of the two year period her progress was satisfactory and she was not suffering as much as it was anticipated she will suffer in the future;
2) The $125,000 award for loss of future earning capacity during the estimated 27.7 years of her work life expectancy is excessive because it is based on an estimated earning capacity of $500 per month, or $6,000 per year. The evidence shows this figure of $500 per month is derived solely from the fact that on one occasion she applied for a $500 per month job. She did not obtain that employment. The only earning capacity proved is $400 per month which for a short time she earned as a receptionist. There is not proof of any training or experience which would qualify her for any particular employment. Thus, the proper figure which should form the basis of this award of $400 per month, or $4,800 per year, a difference of $33,240 in this particular award prior to discount;
3) The 40% disability testified to by one of the medical expert witnesses, which 40% forms a material part of the basis for the awards of $50,000 and $350,000, respectively for pain and suffering to date of trial and thereafter, necessarily had to include some disability attributable solely to the prior disc problem and first surgical fusion.
Because I would reduce the awards in accordance with the above,
I respectfully dissent.

ON REHEARING
On rehearing the court has considered additional oral and written argument and has again reviewed the record with particular emphasis on the question of whether the record supports a conclusion that plaintiff will spend the remainder of her life in substantial pain.
The overall record, with medical evidence that plaintiff's condition is permanent (although probably she will not be required permanently to wear the collar on a continuing basis) and lay evidence that her present life involves daily torture, supports this conclusion. While we would not have initially fixed the award for pain and suffering at such a high figure, our function is not to fix awards, but to review awards for abuse of discretion. We cannot say the awards in this case constitute an abuse of discretion.
Our original decision, affirming the judgment of the trial court, is reinstated.

ON REHEARING
SAMUEL, Judge, dissenting.
For the reasons expressed in my dissent from the original opinion and decree, I remain of the opinion that the award should be materially reduced.
Accordingly, I respectfully dissent.
NOTES
[1] Plaintiff was 33 years old at time of trial.
[2] Defendants also argue Dr. Davis should not have been permitted to testify as to psychotherapy, because R.S. 37:2365 prohibits a psychologist from engaging in psychotherapy "in order to make provision for the diagnoses and treatment of mental illness" except in collaboration and consultation with a licensed physician. The trial court treated the statute as intended to regulate the practice of medicine and, noting that psychiatrists often refer patients to psychologists for this type of testing and evaluation, the court properly overruled the objection to the expert testimony.
[3] La.C.C. Art. 2334 states that "actions for damages resulting from offenses and quasi offenses" are the separate property of the wife. The distinction must be made between the loss of earning capacity and the loss of earnings. The former belongs solely to the wife whereas the product of that capacity would belong to the community. However, the loss of earning capacity is a life-long loss which should be placed in the same category as general damages.