540 So.2d 344 (1988)
Calvin L. VALENTINE, and his wife, Diana B. Valentine
v.
Anthony L. WELLS, Hobbs Construction & Development, Inc., and Aetna Casualty & Surety Company.
No. CA 87 1382.
Court of Appeal of Louisiana, First Circuit.
December 20, 1988.
Rehearing Denied April 19, 1989.
Writ Denied June 16, 1989.
William D. Hunter, Hunter & Plattsmier, Morgan City, for plaintiffs.
Frank M. Coates, Jr., Taylor, Porter, Brooks and Phillips, Baton Rouge, for South Carolina Ins. Co., excess carrier for defendants Anthony Wells & Hobbs Constr.
Before CARTER, LANIER and LeBLANC, JJ.
LANIER, Judge.
This is a suit for damages in tort arising out of an automobile accident in which the front of a following vehicle struck the rear of a preceding vehicle. The plaintiffs are husband and wife and were in the preceding vehicle. The defendants are the corporate owner of the following vehicle, the owner's employee who was driving the following vehicle, and the primary insurer of the vehicle. The defendants stipulated liability, and the case went to trial by jury on quantum. The jury rendered lump sum awards of $1,000,000 in favor of the plaintiff-husband and $110,000 in favor of the plaintiff-wife. The trial court rendered judgment in accordance with the jury's verdicts and denied motions for judgment notwithstanding the verdicts and new trial. The defendants took this suspensive appeal. The excess insurer of the owner of the following vehicle and its driver took a devolutive appeal.[1] While this appeal was pending, the primary insurer settled with the plaintiffs and was released. The plaintiffs reserved their rights against all other parties to this appeal, subject to a credit for the amount paid by the primary insurer.[2] The plaintiffs answered the appeals seeking increases in their awards.

*345 FACTS
On April 24, 1985, at approximately 9:10 a.m., Calvin L. Valentine was operating his 1969 GMC pickup truck in a southerly direction on First Street in the city of Morgan City, St. Mary Parish, Louisiana. Mr. Valentine's wife, Diana B. Valentine, was riding as a guest passenger in this vehicle. At the same time and place, Anthony L. Wells was operating a 1979 Chevrolet dump truck owned by Hobbs Construction & Development, Inc. (Hobbs) in a southerly direction on First Street, and the front of this vehicle struck the rear of the Valentine vehicle. The Valentine vehicle was knocked into a parked car and struck by the truck again. Wells was an employee of Hobbs and was acting in the course and scope of his employment. Aetna Casualty & Surety Company (Aetna) was the primary insurer of Hobbs and Wells. South Carolina Insurance Company (South Carolina) is the excess insurer of Hobbs and Wells.

QUANTUM
Appellants assert the judgments in favor of Mr. and Mrs. Valentine are "grossly disproportionate and excessive" and should be reduced. The Valentines contend the judgments are inadequate and should be increased.
The jury rendered a lump sum award for damages of $1,000,000 for Calvin and $110,000 for Diana. The proper standard for appellate review of a trial court's award of damages is set forth in Reck v. Stevens, 373 So.2d 498, 501 (La.1979), as follows:
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, ... or insufficient,.... Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited functionif indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) "similar" injuries, see Coco [v. Winston Industries, Inc.,] at 341 So.2d [332], 334 [(La.1976)].
However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. [Citations omitted.] [Footnote omitted.]
Neither special verdicts nor interrogatories were used in the trial court to itemize the elements of damage. A lump sum judgment of damages is normally presumed to award all items of damage *346 claimed, and the appellant's burden of proving that the fact finder abused its much discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable. Each case must be determined on its own facts and circumstances, and we must examine each element of damage claimed to determine if there was an abuse of discretion. See Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064 (La.App. 1st Cir.), writ denied, 433 So.2d 1056 (La.1983).
Accordingly, we must examine the record to determine whether the jury abused its discretion in its quantum awards. If we find an abuse of discretion, the award must be reduced to the maximum amount or increased to the minimum amount which was reasonably within the discretion of the trial court.

Mr. Valentine's Damages
Mr. Valentine sought recovery for the following elements of damages: (1) medical expenses; (2) loss of income and impairment to earning capacity; (3) injury to his head, back and spine; (4) pain, suffering, mental anguish, distress and emotional upset; and (5) loss of consortium.
After the accident, Mr. Valentine was taken to Lakewood Hospital in Morgan City where he was treated by Dr. Verne Thibodeaux. After two or three days, he requested to be discharged from the hospital because his wife was also in the hospital and his children were at home. Following his release from the hospital, his back started bothering him, so he sought treatment from Dr. Thibodeaux. He was readmitted into Lakewood Hospital where he stayed for seven days and was put into traction for lumbar sprain. After this hospital stay, his back did not get any better, so he was put into the hospital a third time for approximately ten days.
Mr. Valentine testified his back never got any better. He had a burning sensation in his low back and numbness down his legs. He could not bend, walk, sit or stand for very long without pain. He plans to see Dr. Kenneth Vogel and let him perform a rhizotomy. However, he was told by Dr. Vogel that this procedure would only relieve about 40% of his pain.
Mr. Valentine testified that before the accident he was in good health and worked as a machinist at E.J. Fields Machine Shop in Morgan City. He had worked there for thirteen years prior to the accident. He started working there as a welder's helper and worked up to the position of shop foreman. His job consisted mostly of manual labor. At the time of the accident, he was making $11.50 per hour and would work all the overtime he could get. In 1984, the year before the accident, his gross income was $29,494.
Since the accident, Mr. Valentine has not worked. He stated that he has tried to find work, but, because of pain, he is not physically fit to go to work. He has tried to find parttime work, but no one would hire him because of his back problem.
Mr. Valentine testified that, since the accident, his sex life "is just about gone" because he is always in pain. He has seen many doctors for his sexual problems, and they all tell him that it is because of the pain in his back. Before the accident, he and his wife, Diana, had a "beautiful marriage." Since the accident, things between them have been difficult; their marriage is "just about breaking up."
Mrs. Valentine testified that, prior to the accident, Calvin spent a lot of time with their three children. Since the accident, he is unable to take them places or spend time with them because of the pain in his back. Most of his time is spent on heating pads or taking hot baths. His pain medication slows him down and makes him "woozy." She further stated that the medication "rests him; but it doesn't really relieve the pain."
Dr. Verne Thibodeaux examined and treated Mr. Valentine. He testified at trial that he was the Valentine family physician and that Mr. Valentine was in good health before the accident. His diagnosis of Mr. Valentine on admission to Lakewood Hospital after the accident was a cerebral concussion, a cervical strain, a lumbar strain, *347 and a contusion to the lower anterior ribs. Dr. Thibodeaux stated that Mr. Valentine was in pain during his stay in the hospital.
Dr. Thibodeaux continued to treat Mr. Valentine after he was released from the hospital. Dr. Thibodeaux testified that Mr. Valentine continued to have headaches, neck pain, and low back pain. Mr. Valentine's head and neck gradually improved, however, he still had persistent back pain several months after the accident. He treated Mr. Valentine for his back pain with muscle relaxants, analgesics, and physical therapy.
Subsequently, Dr. Thibodeaux referred Mr. Valentine to Dr. Donald J. Judice in Houma, Louisiana, and to Dr. Rand M. Voohries at Ochsner. Dr. Judice wrote Dr. Thibodeaux a letter stating that he thought Mr. Valentine had a lumbosacral strain, and his symptoms would resolve with time and treatment. Dr. Thibodeaux testified that Mr. Valentine's symptoms did not resolve. Dr. Voohries thought that Mr. Valentine could have a disc herniation or a redicularopathy (injured nerve).
Dr. Thibodeaux testified that Mr. Valentine was then sent to Dr. Lawrence Russo. Dr. Russo suggested that he had a bulging disc at L-4, L-5 causing redicularopathy.
Mr. Valentine then saw a Dr. Scully at Ochsner. Dr. Scully, who is involved with rehabilitation, suggested physical therapy for him. In compliance with this suggestion, he underwent physical therapy at Lakewood Hospital.
In 1986, Mr. Valentine continued to complain to Dr. Thibodeaux of pain in his back and pain radiating down his legs. Dr. Thibodeaux made an appointment for him to see a Dr. Goldware, a neurosurgeon, in Lafayette, Louisiana. Mr. Valentine continued to have pain during all of 1986. He sought help from Dr. Pete H. Rhymes, an orthopedic surgeon. Dr. Rhymes' diagnosis was facet joint syndrome at L-4, L-5. Dr. Thibodeaux explained this meant that the facet between the L-4, L-5 vertebrae is either under strain or having some arthritic inflammation. It may be misaligned and produce pressure on the nerve going down the leg or to the foot. Dr. Thibodeaux treated Mr. Valentine through 1986. Since the date of the accident, Mr. Valentine has not returned to work. Dr. Thibodeaux prescribed a TENS unit (an electrical stimulating unit) for Mr. Valentine. A TENS unit relieves muscle spasms and is a treatment for pain; however, it is not a cure.
Dr. Thibodeaux has done employment examinations for employers in the Morgan City, Berwick, and Patterson areas, and he would not approve Mr. Valentine for employment. Dr. Thibodeaux diagnosed him as a chronic pain case.
Dr. Lawrence Russo, whose testimony was introduced at trial through a video deposition, testified that he first examined Mr. Valentine on June 25, 1985. He thought Mr. Valentine had a L-4 disc herniation and recommended conservative treatment. He subsequently referred Mr. Valentine to Dr. Kenneth Vogel, a neurosurgeon in New Orleans, because of continued pain in his back with pain radiating down the back of his thighs. He thought Mr. Valentine might have a facet syndrome, and Dr. Vogel helps patients with this type of injury. When asked if there was any treatment for facet joint syndrome, Dr. Russo stated that facet rhizotomies (sticking a needle through the skin and burning little nerves in the facet) sometimes gives patients relief, however, more often than not, it does not. The only thing that can be done then is to fuse the joint, but the patient would have to give up some mobility. Dr. Russo opined that, even though a patient had a fusion, he could still have problems with his back. Dr. Russo testified that an operation to fuse the joint would cost approximately $6,000 to $7,000. He stated that he could say with confidence that Mr. Valentine has facet joint syndrome. Dr. Russo felt that Mr. Valentine was unable to perform any gainful employment as a laborer and that he probably can never go back to work as a machinist. Dr. Russo also gave the following testimony:
Q Doctor, isn't it true that Mr. Valentine has been disabled from returning to work during this entire period of time you've been treating him?
*348 A Yes. As far as I know, he's been disabled, because he wasn't able to return to his previous employment, and as far as I know, his educational background would not allow him to perform a more sophisticated type of work or even a sedentary type of work, and thirdly, I don't think he could find a job. I don't know anybody in their right mind that would hire him if he walked in there and said he's got back problems and he hurts everyday.
Q And it's your experience in the Morgan City area where he lives, that people just don't hire guys like him with back trouble, who have a chronic pain problem?
A That's right.
He testified that Mr. Valentine will be in pain for the rest of his life and that he is still actively treating him.
Dr. Jeffery Fitter, an orthopedic surgeon who once was in partnership with Dr. Russo, examined Mr. Valentine once on October 9, 1985. He testified he would not recommend that a person with facet joint syndrome return to work as a machinist. He also stated that Mr. Valentine could not compete in the work force.
Dr. Kenneth Vogel, a neurosurgeon whose testimony was introduced through a video deposition, stated that Mr. Valentine was referred to him by Dr. Russo. An examination of Mr. Valentine on March 24, 1987, revealed positive findings in his low-back region, mild limitation of motion with flexion limited to 70 degrees, mild muscle spasms on the right, and mild scoliosis to the left (an abnormal curvature of his back to the left side). The straight-leg test was positive at 70 degrees on both sides with pain crossed from left to right. The motor examination was normal, although limited by pain. Sensory examination or feeling revealed pin prick hypalgesia or partial in the little toe or lateral foot side on both legs; reflexes were posteriorly normal. There was point tenderness of the lower lumbar facets or joints on both sides at the lowest point. Dr. Vogel had a lumbar facet arthogram done on Mr. Valentine. The results of the arthrogram revealed that Mr. Valentine had pain from his L-4, L-5 facet. Dr. Vogel injected Mr. Valentine with an anesthetic and cortisone from which he obtained four hours of pain relief, after which the pain returned. Dr. Vogel recommended that Mr. Valentine be hospitalized for lumbar medical branch neurotomy, which will cost approximately $6,500 to $7,000. This procedure will hopefully relieve him of some of his pain.
Dr. Pete Rhymes, an orthopedic surgeon, testified that he first saw Mr. Valentine on May 29, 1986. He stated that Mr. Valentine told him that he had numbness and burning pain down his right leg with numbness in his right big toe and some weakness in his right knee. Dr. Rhymes did a contrast CAT scan and a CAT scan of Mr. Valentine's back. These tests were normal. He also did a lumbar myelogram and a diskogram which were also both normal. Dr. Rhymes' diagnosis was facet joint syndrome. Dr. Rhymes testified as follows:
A ... In facet joint syndrome, the facet joints are irritated and tight and swollen. And if they are swollen too much, then they can cause chronic pressures on there [sic] nerves coming out here. If they are not, and if they are just irritated and tight and inflammed themselves, they may be causing pain on both ends of the back as it moves back and forth.... It is like the old sprained ankle that has basically been around for a long time because this is what this is. You can sprain the joint.
Dr. Rhymes felt that Mr. Valentine will never get back to normal and will always be in chronic pain. There were procedures that could be done to lessen the pain, such as a rhizotomy or fusion. However, the fusion could create other problems. Dr. Rhymes said that, even if the two procedures were performed on Mr. Valentine, he will still have pain for the rest of his life and will never be able to go back to any type of manual labor. He also stated that Mr. Valentine could not pass an employment physical.
Before trial, it was stipulated by the parties that Mr. Valentine's past medical *349 expenses are $39,669.29. Mr. Valentine testified that he planned to let Dr. Vogel perform a rhizotomy and a fusion on his back. Based on estimates from the physicians who testified, the cost of these two surgeries will be between $12,500 and $14,000.
Ferris Romaire, vice-president and general manager of E.J. Fields Machine Works, testified that Mr. Valentine was a very dependable and hard working employee before the accident. In 1984, the year before the accident, Mr. Valentine's gross regular pay was $22,208.80, his overtime pay was $6,634, and he received a bonus of $350. Mr. Valentine's duties involved bending and picking up heavy loads. Mr. Valentine's employment was terminated after the accident because the machine shop's insurance company would not cover him; if he had not been injured, he still would be working for the company.
Dr. Randy Rice, an economist, was called by the plaintiffs and was accepted by the court as an expert in computing lost wages. Dr. Rice testified that, based on Mr. Valentine's past income tax returns, his past lost wages from the time of injury until the date of trial is $60,362. Dr. Rice estimated Mr. Valentine's future loss earning to be $530,480. This figure was based on an expected work life of 23.76 years (until the age of 60based on Department of Labor surveys), an annual increase factor of 5% and a discount rate of 7½%. This rate was based on the assumption that Mr. Valentine will never return to any type of employment. This testimony stands uncontradicted in the record.
The defendants do not contest the calculation of the loss of past earnings of $60,362. They vigorously contest the $530,480 amount as excessive. An award for impairment of earning capacity is not predicated only upon the difference between a person's earnings before and after a disabling injury but also encompasses his loss or reduction of earning capacity. Smith v. Porche Brothers Lumber and Supply, Inc., 491 So.2d 412 (La.App. 1st Cir.1986). In Smith v. Porche Brothers Lumber and Supply, Inc., at 415-416, the court stated, as follows:
In determining an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity.... Other facts which may be considered in fixing awards of impairment of earning capacity are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and the inflation factor.... However, before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made by the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. [Citations omitted.]
The record shows that before the accident Mr. Valentine was employed as a machinist for thirteen years. At the time of the accident, he was making $11.50 per hour and worked all the overtime he could get. He is a high school graduate and has had no special training, except for on-the-job training as a machinist. He has not worked since the accident. Several of the doctors who testified at trial stated that he can never go back to work as a machinist and is unable to perform any gainful employment as a laborer. Dr. Rice's estimations of his loss of earnings was the only evidence the jury heard. Defendants did not call any witnesses to rebut Dr. Rice's testimony. The jury obviously accepted Dr. Rice's testimony.
After considering all of the above facts, we are of the opinion that Dr. Rice's estimations of Mr. Valentine's loss of wages could have reasonably been accepted by the jury. See, for example, Brown v. Southern *350 Farm Bureau Insurance Co., 426 So. 2d 684 (La.App. 1st Cir.1982).
The final elements of damage claimed by Mr. Valentine are (1) injury to head, back and spine; (2) pain, suffering, mental anguish, distress and emotional upset; and (3) loss of consortium. To determine how much the jury awarded for these damages, we must recapitulate the previously discussed damage awards. They were as follows:

(1) past medical $ 39,669.29
(2) future medical 14,000.00
(3) past loss of wages 60,362.00
(4) future loss of wages and
 earning capacity 538,480.00
 ___________
 TOTAL $652,511.29

Since the lump sum award was $1,000,000 and $652,511.29 was given for other elements of damage, the amount given for these elements of damage was $347,488.71.
After carefully reviewing the record, we find that this amount is adequate to compensate Mr. Valentine for these damages. See, for example, Joseph v. Ford Motor Company, 499 So.2d 428 (La.App. 4th Cir. 1986), amended and affirmed on other grounds, 509 So.2d 1 (La.1987); Labit v. Setiff, 489 So.2d 942 (La.App. 5th Cir.1986); Thibodaux v. Acme Truck Lines, Inc., 443 So.2d 716 (La.App. 5th Cir.1983), writ denied, 445 So.2d 439 (La.1984). The jury's in globo award of $1,000,000 for damages falls within the range of discretion afforded it, and it is not legally inadequate or excessive under the circumstances of this case.

Mrs. Valentine's Damages
Mrs. Valentine sought recovery for the following elements of damages: (1) medical expenses; (2) loss of income and impairment to earning capacity; (3) damages to her ribs, shoulder, knee, back and spine; (4) pain, suffering, mental anguish, distress and emotional upset; and (5) loss of consortium.
She testified that on impact her knees struck the dashboard, her head snapped back towards the windshield, and she lost consciousness. She was taken to Lakewood Hospital where she stayed for six days. Subsequently, she was readmitted into the hospital because of complaints of headaches, neck pains, backaches, and knee pains. While in the hospital the second time, she was treated with "traction, EGS, diathermy, and heating pads."
At the time of trial, Mrs. Valentine was still seeing Dr. Russo who was treating her for her knees and neck. Her back, neck and knees still hurt her, and the pain in her knees was aggravated by walking and sitting. She was depressed, and Dr. Russo prescribed "Sinnequam" for her depression. Because of her medical problems, the quality of her marriage has changed. She testified that she and Mr. Valentine were "always at each other's throat about either the children or something that is not done in the house or different things."
She described her past work history as including (1) South Central Bell as a directory assistant; (2) Baroid, Inc. as a dispatcher; and (3) W.J. Answering Service as a switchboard operator. Although not working at the time of the accident, she testified that she reapplied for a job with South Central Bell but was rejected after submitting an application and physical form. Finally, she testified that she felt she needed and and wanted to return to employment in order to assist the family but could not find an employer who would hire her with her continuing complaints of pain.
Mr. Valentine testified about the damage their marriage sustained as a result of their injuries. He said that Diana is in pain and is depressed. Because both of them suffer daily, they find it almost impossible to communicate and family discussions become fussing and arguments. Mr. Valentine testified that she had attempted to go back to work after the accident because of the financial difficulties the family was suffering due to his disability. He also testified that, after her application and physical examination were received, she was rejected.
Dr. Thibodeaux first examined Mrs. Valentine after the accident when she was admitted into the hospital. She was readmitted for further treatment on May 23, *351 1985, and was released on May 31, 1985. Dr. Thibodeaux stated that her complaints consisted of neck pain, low back pain, midback pain, headaches, right knee pain and left shoulder pain. She was treated with pain medication, muscle relaxants, physical therapy and rest. In July of 1985, Mrs. Valentine started complaining about pains in both of her knees. Dr. Thibodeaux tried to treat her with physical therapy, pain medication and exercise. This treatment did not seem to help, therefore, he sent her to Dr. Fitter, an orthopedic specialist. Dr. Thibodeaux was still treating Mrs. Valentine in the latter part of 1985, and she continued having pain in her neck and low back. These pains had become secondary to her knee pain. In 1985, she also sought treatment from Dr. Chris Cenac and Dr. Menale, an orthopedic surgeon. Dr. Thibodeaux subsequently referred her to Dr. Rhymes.
Dr. Lawrence Russo, a neurosurgeon, testified that he first saw Mrs. Valentine on July 1, 1985. Dr. Russo's examinations and treatment of her led him to conclude that she suffered from chronic cervical and lumbar strains, as well as patellofemoral joint contusions, which has caused a roughness of the knee joint. All of the tissue damage suffered by her has caused pain which has been protracted and, more or less, continuous. Dr. Russo felt she also suffered from depression that required medication treatment. Dr. Russo expressed the opinion that her continued pain caused and exacerbated her depression. In turn, her depression is exacerbating her symptoms.
Dr. Rhymes testified that he first saw Mrs. Valentine on January 14, 1986. He took X-rays of both of her knees which showed some chondronalities. Because Mrs. Valentine continued to have pain in her knees, he performed an arthrogram of her knee joints. This involved injecting dye into the joints and taking X-rays. The arthrogram was normal so he treated her with braces, exercises, and anti-inflammatory drugs. Her pain persisted and by September of 1986, Dr. Rhymes felt that an arthroscopy of her right knee was required. After completion of that surgical procedure, Dr. Rhymes felt that she suffered from traumatically induced chondromalacia of her knees, caused by the accident. Chondromalacia is caused by bruising of a joint resulting in uneven joint surfaces rubbing against one another causing a painful joint. Dr. Rhymes testified that Mrs. Valentine also suffers from a chronic lumbar back strain, and only time will tell if her condition will get better or worse.
Dr. Rice testified that Mrs. Valentine has a life expectancy of 42.56 years and a work life expectancy of 17.31 years. Dr. Rice was asked to calculate her future loss of income production in the event her injuries prevented her from reentering the labor market. Dr. Rice computed a potential future wage loss of $126,450, using an annual increase factor of 5% and a discount rate of 7½%. He also used a wage rate of $4.50 per hour and based the figure on the assumption that she will never be able to return to any type of employment.
It was stipulated that Mrs. Valentine had past medical expenses of $21,996.82. Dr. Russo testified he would continue to treat Mrs. Valentine for an indefinite period of time. However, no evidence was introduced to show the type of future medical treatment or its anticipated cost. The evidence is insufficient to support an award for future medical expenses. Since Mrs. Valentine was awarded a lump sum of $110,000 and $21,996.82 must have been given for past medical expenses, the amount given for (1) loss of earning capacity, (2) injury to ribs, shoulder, knees, back and spine, (3) pain, suffering, mental anguish, distress and emotional upset, and (4) loss of consortium was $88,003.18.
The evidence supports an award in favor of Mrs. Valentine for loss of earning capacity. Even though she was not working at the time of the accident, she is entitled to recover for impairment of her earning ability. Folse v. Fakouri, 371 So.2d 1120 (La. 1979). The evidence shows Mrs. Valentine suffered physical injuries as a result of the accident and has, and will have, mental and physical pain and suffering. The evidence also supports an award for loss of consortium. *352 Finley v. Bass, 478 So.2d 608 (La. App. 2nd Cir.1985).
After carefully reviewing all of the evidence, we conclude that the jury's lump sum award of $110,000 for damages to Mrs. Valentine falls within the range of discretion allowed to it. The award is in the lower end of the range based on the facts of the case, but it is not inadequate. See, for example, Cox v. Cadaro, 484 So.2d 177 (La.App. 5th Cir.1986); Tate v. Trinity Universal Insurance Company, 465 So.2d 235 (La.App. 3rd Cir.1985); London v. Bell, 422 So.2d 260 (La.App. 4th Cir.1982); Legrone v. New Orleans Public Service, Inc., 415 So.2d 997 (La.App. 4th Cir.1982); Pierrotti v. Associated Indemnity Corp., 399 So.2d 679 (La.App. 1st Cir.1981).

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. The defendants are cast for the cost of this appeal.
AFFIRMED.
NOTES
[1] La.C.C.P. art. 2086 provides as follows: "A person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken." A third person may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto. La.C.C.P. arts. 1091 and 1092. Thus, even though a person was not a party to an action in a trial court, he may take an appeal if he has a right which is sufficiently affected by the judgment in the case. See, for example, Tooley v. Pennison, 250 La. 303, 195 So.2d 276 (1967); Alex v. Heirs of Alex, 479 So.2d 664 (La.App. 3rd Cir.1985); Bradley v. Central Louisiana Electric Company, Inc., 437 So.2d 999 (La. App. 3rd Cir.1983); Roman v. Zuppardo, 407 So.2d 65 (La.App. 4th Cir.1981).
[2] Aetna paid $531,889.22 to Mr. Valentine, $53,178.93 to Mrs. Valentine and $2,000 (probably for collision damages) to New Hampshire Indemnity Company as subrogee of Mr. and Mrs. Valentine. Hobbs filed a peremptory exception raising the objection of res judicata in this court "with respect to its liability for coverage afforded to it by Aetna Casualty & Surety Company and with respect to all liability not covered or insured by any excess insurance policy." [Emphasis added.] In oral argument, Hobbs, through counsel, advised that the purpose of the exception was to insure that Hobbs will be given proper credit for the payments made by Aetna. Hobbs conceded this is not really an objection of res judicata. Accordingly, we decline to consider it.