558 So.2d 1143 (1989)
Daryll LANDRY and Ramona Landry
v.
Paul U. MELANCON, et al.
No. 88CA1918.
Court of Appeal of Louisiana, First Circuit.
December 19, 1989.
*1144 Charles B. Plattsmier, Hunter and Plattsmier, Morgan City, for plaintiffs.
Dale H. Hayes, Morgan City, John Wilkes, Lafayette, Christopher E. Lawler, and John J. McGuckin, Jr., Metairie, for Paul U. Melancon and Prudential Property & Cas. Ins. Co.
Stephen M. Larussa, Houma, for Allstate Ins. Co.
Before COVINGTON, WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
Daryll and Ramona Landry brought suit against Paul U. Melancon, Allstate Insurance Company, and Champion Insurance Company as a result of a rear-end collision in which Ramona Landry (plaintiff) was allegedly injured. Two months before trial plaintiff named Prudential Insurance Company as an additional defendant. Prudential had previously been third partied into the case by Melancon. Champion was dismissed by plaintiff and Allstate tendered its $100,000.00 policy limits into the registry of the court before trial.
*1145 The case proceeded to trial by jury against Melancon, Prudential and Allstate (defendants). Judgment was rendered in favor of plaintiff for $734,000.00 and in favor of Mr. Landry for $50,000.00 for loss of consortium. Defendants have appealed.
Liability was stipulated at trial by defendants, and they assigned as error the following: that the trial court erred in failing to grant a continuance; that it erred in excluding defendants' vocational rehabilitation expert; that it erred in admitting allegedly hearsay statements made by Dr. Charles R. Brent; and that the award to plaintiff and Mr. Landry is too high.
THE CONTINUANCE
On December 18, 1986, plaintiff and her husband were travelling in their pickup truck when they were struck in the rear by Melancon. Suit was filed against Melancon, Allstate and Champion on January 30, 1987. On March 12, 1987, plaintiff underwent surgery for the removal of three cervical discs and for a four-level fusion. On November 12, 1987, Melancon filed a third party demand against Prudential and his insurance agency, alleging that he had paid a premium for a $1,000,000.00 personal catastrophe insurance policy and that Prudential should provide coverage. Prudential denied coverage. It was not until April 25, 1988, that Prudential undertook Melancon's defense. On May 25, 1988, plaintiff filed her demand against Prudential. The case proceeded to trial on July 25, 1988, nineteen months after the accident.
Prudential does not argue that it was given inadequate time to prepare a defense by this sequence of events; rather, it seizes upon the May, 1988, consultation of a psychologist by plaintiff and the ensuing diagnosis of chronic pain syndrome as prejudicing its case. Succinctly, Prudential's position is that because plaintiff entered the Touro Pain Clinic in New Orleans the weekend following the trial, and because the diagnosis of chronic pain syndrome was made two months before trial, the trial was premature. We find, however, that plaintiff's chronic pain syndrome was merely a logical continuation of her condition throughout the course of treatment of the serious injury to her neck. In October 1987 her treating neurosurgeon, Dr. Donald Judice, in deposition testified that plaintiff would continue to have residual pain from the internal scarring resulting from a four-level fusion of the cervical spine he had performed in March. Although he was unable to say that she was a chronic pain patient because she had not yet reached maximum medical benefit, he believed that even with an excellent recovery she would continue to have residual pain.
Defendants argue that they were prejudiced because the jury saw plaintiff at her worst; shortly after the trial, she was to enter the Touro Pain Clinic, and Dr. Richard Morse, its director, testified at trial that she would receive training in pain management and could expect to become more functional after her treatment. However, we find no prejudice. Dr. Morse, Dr. Judice, and Dr. Aurich, the consulting psychologist who diagnosed chronic pain syndrome, all testified that plaintiff was an excellent candidate for a pain clinic and that she could expect good results from the Touro Pain Clinic. The jury heard from several witnesses that plaintiff would, in all probability, benefit greatly from that treatment. Therefore, defendants were not prejudiced; there was no question at trial that although nobody could guarantee plaintiff complete relief from her chronic pain, she could become more functional in her daily life by learning how to tolerate her pain.
Defendants cite Sparacello v. Andrews, 501 So.2d 269 (La.App. 1st Cir.1986) writ denied, 502 So.2d 103 (La.1987), for the proposition that a discretionary continuance under LSA-C.C.P. art. 1601 is subject to a balancing test by the trial court. The trial court must consider diligence, good faith, and reasonable grounds, balanced against the possibility of injustice resulting from a premature trial and the effect a continuance may have on the administration of justice. We find that there was no abuse of discretion here by the trial court in denying a continuance to defendants. The trial was not premature because of a worsening of plaintiff's condition; her condition *1146 remained constant up until trial. No prejudice resulted to defendants because they were able to cross-examine Dr. Aurich and Dr. Morse about the therapeutic effects of a pain clinic on plaintiff's chronic pain. See Ulmer v. Baton Rouge General Hospital, 361 So.2d 1238 (La.App. 1st Cir. 1978). We will not disturb the trial court's ruling.
EXCLUSION OF VOCATIONAL REHABILITATION EXPERT'S TESTIMONY
Defendants' next assignment of error concerns the trial court's refusal to allow Glenn Hebert, defendants' vocational rehabilitation expert, to testify at trial. The trial court's written reasons for ruling on this issue disclose that under LSA-C. C.P. art. 1425, defendants did not reveal the substance of facts to which Hebert was expected to testify in response to plaintiff's interrogatories of May 25, 1988. Although defendants revealed Hebert's name as a potential expert witness in their response to the interrogatories filed June 22, 1988, no mention was made of the substance of Hebert's facts, and a report was not provided to plaintiff until July 11, 1988. The trial judge suggested that Hebert's deposition be taken before he ruled on any prejudice to plaintiff, and that was done on July 11, 1988, one week before trial. In deposition, Hebert testified that the medical picture had changed completely from his initial market survey performed earlier; that since plaintiff was, according to Dr. Judice, incapable of performing any work at all outside the home, his earlier market survey which considered part time clerical work as possible sources of income for plaintiff was rendered invalid; that he believed there was sheltered employment available for plaintiff, but had not performed any market surveys to determine what jobs were actually available. The trial judge found that Hebert's testimony placed plaintiff in the position of having to hire an expert at the last minute to rebut this testimony, or alternatively of consenting to a continuance. Therefore, the trial judge found plaintiff would be prejudiced if he allowed Hebert to testify at trial.
Defendants argue that Hebert was not able to finalize his opinions because of the last-minute diagnosis of chronic and totally disabling pain made two months before trial; that they provided as much information to plaintiff as they were capable of giving to her under these circumstances; and that, rather than being dilatory in responding to discovery requests, it was plaintiff's "interjection" of chronic pain and psychological elements into the case which obstructed discovery efforts.
It is within the trial court's discretion to exclude witnesses from testifying at trial if a party does not adequately respond to an interrogatory requesting the identity of witnesses. Llorence v. Natchitoches Parish School Board, 529 So.2d 479 (La.App. 3rd Cir.), writ denied, 532 So.2d 176 (La. 1988). Defendants waited one month after the initial interrogatory request to provide even the name of their expert witness to plaintiff. After that, it was another three weeks before a report was sent which was so general as to give plaintiff next to no information. We find no abuse of discretion in the trial court's decision to exclude Hebert's testimony.
HEARSAY TESTIMONY OF DR. BRENT
During the examination of plaintiff at trial, plaintiff's counsel elicited testimony concerning her decision to undergo a very serious operation to her neck three months after her accident. Plaintiff testified that after consulting with Dr. Judice, her treating neurosurgeon, she decided, upon the recommendation of her family doctor, Dr. Robert Blereau, to seek a second opinion from Dr. Charles R. Brent, a neurosurgeon at Tulane in New Orleans. Plaintiff testified, when asked what Dr. Brent said, "He recommended the surgery." Defendants made their objection to this line of questioning continuing, arguing that any statements made by Brent to plaintiff concerning her injury were hearsay and should be excluded. Dr. Brent was not called to testify at trial.
The trial judge admitted the statements, reasoning that "[i]f it leads to her having made a decision to undergo surgery as a result of these statements made by the *1147 doctor, the statements are not offered for the truth of the statement; but rather as the basis for which she underwent the surgery." Defendants argue that the reason plaintiff underwent surgery was not at issue in the trial, and that since they contested causation of plaintiff's injuries, Dr. Brent's statement that plaintiff needed surgery was prejudicial to Prudential's and Allstate's defense of the case.
We agree with defendants that the statements were hearsay. Paul v. St. Paul Fire & Marine Insurance Company, 430 So.2d 285 (La.App. 3d Cir.1983), is on point. In that case, plaintiff testified that she heard a doctor tell her father, during a telephone conversation, that she would need surgery. The plaintiff's attorney argued, as plaintiff's counsel did here, that the testimony was admissible to show the effect the statement had on the plaintiff's state of mind. The trial court excluded the testimony, and the Third Circuit agreed, finding that the relevancy of the statement was clearly directed toward the truth of the doctor's statement rather than toward the fact of the utterance.
Here Dr. Brent's statement went to show that plaintiff did in fact require surgery for three cervical discs. Its relevance was that plaintiff was injured and needed surgery. However, we find that the trial court's allowance of the statement into evidence was harmless error. Defendants contest causation of the injuries, not the fact that plaintiff actually underwent surgery. The statement by Dr. Brent does not address whether or not plaintiff actually had three discs, one disc, or nerve damage based upon diabetes; rather, it affirms that plaintiff needed surgery. Considering all other medical testimony that plaintiff had no neck problems before the accident, the jury's conclusion that plaintiff's injuries were caused by the rear-end collision of December 12, 1986, and not by her pre-existing diabetic condition, could easily have been reached without the hearsay statement made by Dr. Brent.
QUANTUM
Defendants ask us to review the award of $734,000.00 to plaintiff on three different bases: first, that the jury awarded $50,000.00 in medical damages erroneously; secondly, that despite plaintiff's sporadic work history, the jury awarded $150,000.00 in loss of future earnings; third, that the general damage award, which they argue was $500,000.00, was simply too high. We are unable to perform this task in this way because the jury award was in globo, and defendants did not ask for an itemization for specific elements of damages, either by special verdicts or by interrogatories. A lump sum award is generally presumed to award all items of damages claimed; we are unable to ascertain the jury's intention to award a specific sum for any particular item of damages, and will not speculate. Valentine v. Wells, 540 So.2d 344 (La.App. 1st Cir.), writ denied, 546 So.2d 178 (La.1989).
Dr. Judice testified at trial that, including $15,000.00 for treatment at Touro Pain Clinic, the cost for a possible second surgery to plaintiff and all other accompanying medical treatment would be $50,000.00. The prior four-level fusion surgery cost approximately $14,500.00. Defendants argue that plaintiff did not prove that a future operation would be necessary. However, plaintiff should be able to recover for future medical treatments whether the nature and extent of treatment is precisely established, and whether the exact cost of the treatment is known. Cushman v. Fireman's Fund Insurance Company, 401 So.2d 477 (La.App. 2d Cir.1981). Although defendant's expert medical witness testified that he did not think a second surgery was necessary, the jury was entitled to give greater weight to the treating physician's testimony concerning future medical treatments.
Plaintiff called an expert economist to testify concerning plaintiff's loss of future earning capacity. Defendants argue any recovery for future earning capacity is speculative because plaintiff had only worked for four years out of sixteen since graduating from high school, and because she was a diabetic whose work-life expectancy would be curtailed. Plaintiff testified *1148 at trial that, although she was not working at the time of the accident, she planned on returning to work in the fall of 1987 when her youngest child entered school. This testimony was not rebutted by defendants, and in fact plaintiff's former employer testified that he had an opening for plaintiff to return to work in the fall of 1987. Her salary would have been $4.75 an hour for a 44-hour week, or $4.00 an hour for a 40-hour week. Dr. G. Randolph Rice, plaintiff's expert economist, testified that based upon a $4.75 hourly rate and a work-life expectancy of 18.63 years, discounting by 8.25% and factoring in an annual raise of 5%, plaintiff would lose $148,656.00 in future earnings; retiring at age 62, she would lose $188,132.00.
The loss of the ability to work is in itself a compensable element of damages. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Earning capacity is not measured by actual loss; even an unemployed, or sporadically employed, plaintiff is entitled to recover for the deprivation of what he could have earned. Folse, 371 So.2d 1120; Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281 (La.1984). Plaintiff testified that she needed to work, and intended to work. We believe that the fact that plaintiff is a woman who has chosen to stay at home to take care of her children, as she testified she had done, rather than work full time, should not be held against her. Defendants' argument would, in effect, penalize women who do not or are not able to establish a stable work history because of other responsibilities.
Defendants argue that the general damages award is unjustified by the record. Specifically, defendants argue that plaintiff's cervical disc problems were caused not by the rear-end collision but rather by a pre-existing diabetic condition which had manifested itself as a "foot-drop" nerve disease. They point to testimony throughout the record that diabetics heal more slowly than others from nerve injuries; that the discs found by Dr. Judice were already degenerated and he could not verify whether that was caused by diabetes or by the accident; that the discs found by Dr. Levy were not herniated but merely bulging; and that plaintiff's diabetic coma in November of 1987 led to depression and a greater perception of pain, and resulted in plaintiff's "chronic pain syndrome."
Dr. Blereau testified plaintiff never had any problems with her neck before the accident. Dr. Judice, who had treated plaintiff for her diabetes prior to the accident, testified she had fully recovered from nerve damage resulting from the onset of diabetes and that she had never exhibited any neck symptoms or nerve problems with her hand or arm prior to the accident. He testified, in response to the question, "Can you state an opinion with reasonable medical probability as to the cause of the herniated discs and the problems that she was having as a result?": "I thought it was from the accident because she had been asymptomatic before." He later testified that, medically speaking, there was no question that her symptoms were secondary to the accident.
The test for determining a causal relationship between plaintiff's operations and subsequent problems, and the rear-end collision at issue, is whether she proved by medical testimony that it was more probable than not that the subsequent operations were caused by the accident. Mart v. Hill, 505 So.2d 1120 (La.1987). The testimony of the treating physician, Dr. Judice, is clear that plaintiff was asymptomatic before the accident; her later radiculopathy and pain, and the herniated discs he viewed on an MRI, CAT scan, and myelogram, were caused by the accident. Defendants speculate that the diabetes caused the discs and ensuing problems, and offer Dr. Levy's testimony only in support of this theory. Lawsuits cannot be decided on speculation or suspicion alone. Mart v. Hill, 505 So.2d 1120. The jury was not clearly wrong in finding that plaintiff carried her burden of proof of causation.
Defendants still argue, however, that the damage award itself was too high. We will briefly review the medical testimony found in the record. Plaintiff was an active, 35-year-old woman with three children and a lifestyle which included camping, *1149 seeing friends, eating out, and participating in her children's softball games. She believed herself to be a good housewife and mother, and so did her husband. Shortly after the accident, her pain was acute; she sought medical treatment and submitted almost immediately to diagnostic tests which revealed that she had at least one herniated disc, according to Dr. Judice who reviewed the initial CAT scan performed at Dr. Blereau's request. On a clinical basis, he thought she had problems indicating a cervical radiculopathy. He recommended an MRI, which showed that C-4, C-5, and C-6 had herniated. He went on to perform surgery, which was extremely difficult since plaintiff was diabetic and he was removing three discs and performing fusions at the same time. Technically, the surgery went well; however, she continued to complain of pain, although her hand and finger symptoms were improved. At present, the range of motion in her neck is extremely limited; for example, she can only bend her head down to 30°, while normal is 90°.
In August 1987 plaintiff testified she began to feel worse; her pain was almost as bad as it was before the surgery. She had been left with residual scarring internally from the surgery, and now suffers from chronic pain syndrome, with accompanying depression. Functionally, from the pain standpoint, Dr. Judice testified she was 100% disabled; and that only time will tell whether it will improve. Even with a good result from a pain clinic, she will be unable to compete in the labor market again. She could perhaps do paperwork if she were in control of her activities, but not for more than a few hours a day. Anatomically, Dr. Judice estimated a 50% disability rating.
The chronic pain syndrome leaves plaintiff in a vicious cycle: the pain causes depression, and depression causes pain. She has become more irritable since the accident and feels she cannot do anything she could do before. Her husband helps out with the children and with housework because she is unable to do it herself. She can do a little grocery shopping, if the groceries are packed carefully. She sleeps very poorly, often getting up five or six times a night. She has suffered a loss of self-esteem, since much of her life was based on taking care of her family and now she is unable to do that to her own satisfaction.
In Polman v. Mohasco Corp., 371 So.2d 838 (La.App. 4th Cir.1979), judgment was affirmed for $400,000.00 in pain and suffering to a woman who sustained torn joints at C-3/C-4 and C-4/C-5 after having undergone previous neck surgery at C-5/C-6 and C-6/C-7. Her problems did not manifest themselves until almost seven months after the accident; at that time she had to undergo another fusion, which failed. The plaintiff in Polman was left totally unable to work outside the home, and with a 40% anatomical disability rating and was also a young mother no longer able to participate in her usual activities with her husband and young children.
Considering all the evidence before the jury, we find the in globo award of $734,000.00 to be within the trial court's great discretion. We likewise affirm the trial court's award of $50,000.00 to Mr. Landry for loss of consortium. Both the Landrys testified that their marital life had suffered because of plaintiff's injury and ensuing pain and depression. Mr. Landry now looks after the younger children and performs cooking and household tasks.
The judgment of the trial court is affirmed. All costs of appeal are assessed to defendants.
AFFIRMED.