GOTHARD, Judge.
This tort action was instituted by Charles L. Seaberry, who alleged that he received a ruptured disc and related psychological injuries, the result of a minor impact in which, while driving his employer’s pickup truck, he rear-ended the pickup truck of the defendant, Jimmy L. Smith.
Plaintiff instituted suit against Jimmy L. Smith, the driver of the offending vehicle, and his liability insurer Horace Mann Insurance Company, for damages resulting from the accident. Also named as a defendant was United States Fidelity & Guarantee Company (USF & G), the underin-sured motorist carrier for plaintiffs employer, the city of Kenner, Louisiana. Plaintiff concurrently made a claim for worker’s compensation benefits, which he began receiving shortly after the accident. USF & G was the city of Kenner’s worker’s compensation insurer, and in that capacity, filed an intervention petition in the tort proceedings, seeking to recover its payments of compensation benefits to the plaintiff.
Eleven members of a twelve member jury found both plaintiff Seaberry and defendant Smith at fault in causing the accident but awarded plaintiff $0 damages, further finding that plaintiff had failed to prove accident related injuries. The trial judge denied plaintiff’s oral motion for judgment notwithstanding the verdict and adopted the jury verdict as the judgment of the court.
Plaintiff Seaberry and the compensation insurer, USF & G, appeal from the jury verdict and raise the following issues:[1]
*1013 (1) Whether the jury erred in finding that the accident was not the legal cause of plaintiffs injuries.
(2) Whether the jury erred in finding that plaintiff was guilty of some negligence which was a legal cause of the accident.
(3) Whether the jury erred in not compensating plaintiff for his injuries.
(4) Whether the trial court erred in permitting Horace Mann Insurance Company to withdraw the $10,000 it had previously deposited into the registry of the Court in order to limit its exposure for liability of its policy limits.
We affirm the jury’s findings that both plaintiff Seaberry and defendant Smith were each at fault in the accident, but we hold the jury was clearly wrong in its finding that plaintiff failed to prove by a preponderance of the evidence that the accident caused him injuries. In so holding, we reverse that portion of the jury verdict which found no accident related injuries, apportion fault equally to plaintiff and defendant Smith, and award damages accordingly.
THE ACCIDENT
The collision occurred on August 15, 1984 at a point just past the Loyola Drive exit off the Interstate Highway 10 (1-10) in Kenner, Louisiana.
Loyola Drive is a four-lane, hard surfaced highway which runs in a generally North-South direction. At the point where the collision occurred the highway provides two lanes southbound and two lanes northbound with a 30 foot wide median between. Immediately prior to the collision, both vehicles were traveling in a southerly direction.
Officer Harry Touchet, from the Kenner Police Department, established that the collision occurred in the left lane of Loyola Drive at the entrance to the World’s Fair Visitor Information Center parking lot. The damage to each vehicle was minor and no one requested emergency assistance. (It was later determined that plaintiff’s front bumper was dented and a signal light broken, and that the defendant’s rear quarter panel over the left rear wheel well was broken.) Officer Touchet testified that at the time of the accident, defendant stated that he made a left turn from the wrong lane and was struck by plaintiff’s vehicle. Defendant denied making this statement. No citations were issued to either party.
Plaintiff and defendant each gave different versions of the cause of the accident.
Plaintiff testified that he was driving south in the left lane on Loyola Drive. He stopped at a red light at the northernmost point of the intersection at which I — 10 overpasses Loyola Drive. While stopped, plaintiff observed the defendant turn right off the Loyola exit of I — 10 onto Loyola Drive and then into an Ecol service station. Soon, the traffic signal changed to green and plaintiff proceeded forward, still in the left lane. As he approached the next traffic signal which was at the southern end of the intersection directly under the I — 10 overpass, that light changed to green also. As plaintiff proceeded south down the highway, in the left lane, the defendant’s vehicle exited the Ecol station and also proceeded south down the highway in the right lane. When defendant came alongside of plaintiff’s vehicle, plaintiff pulled past him. Defendant then passed plaintiff’s vehicle and, according to plaintiff, the defendant’s vehicle “start[ed] coming over” into his vehicle. Plaintiff testified that he applied his brakes, honked and attempted to swerve to avoid striking the defendant’s vehicle. Plaintiff testified that his vehicle was almost at a complete stop when the impact occurred, and that defendant did not stop after the impact but continued on into the entrance of the parking lot.
On the other hand, defendant Smith testified that prior to initially moving from the right to left lane he first checked both his left side mirror and rear view mirror and did not see plaintiff’s vehicle. He then put on his left turn signal and changed lanes. He then “proceeded straight ahead” in the left lane before attempting to execute the *1014 left turn off of the highway onto the entrance for the parking lot. Defendant further testified that from the time he turned right onto Loyola Drive until the point of impact took about one minute. He denied driving in and out of the Ecol service station.
Plaintiff presented two witnesses to the accident, his co-worker, Todd Krupp, who was riding in the pickup with plaintiff at the time of the accident, and Marilyn James, an acquaintance and employee at the Ecol service station. Mr. Krupp testified that he and the plaintiff “were going down Loyola Drive in the left lane ... [defendant] was in the right lane, he was going to try and make a left turn, he was like right next to us and he just tried to cut over quick.”
Ms. James testified that she observed plaintiffs pickup in the left lane and the defendant’s pickup in the right lane. At the entrance to the parking lot, the defendant “pulled in front of the [plaintiff’s pickup] and they collided.”
Following the accident, defendant developed back pain for which he subsequently underwent a discectomy and laminectomy to remove a ruptured disc.
ALLOCATION OF FAULT
After hearing the evidence, the jury determined that both plaintiff and defendant were at fault in causing the accident. Plaintiff argues that the jury’s findings were clearly wrong, and contends the accident was the fault of defendant Smith for changing lanes when it was not safe to do so. Plaintiff argues that his own fault, if any, should be no more than 5 percent; defendants argue 95 percent.
It is difficult for us as it must have been for the jury to fairly determine by whose fault the accident occurred. There is contradictory testimony as to whether defendant Smith attempted to execute his ill-fated left turn from the right lane or the left lane or the left lane of the highway, and whether he could do so with safety. There is no evidence of skid marks evidencing a sudden braking or attempt to avoid the collision, nor does the record establish the exact point of impact on plaintiff’s vehicle other than the front.
If the jury determined that defendant attempted to turn left from the right lane, they could have reasonably found that his negligence was a contributing cause of the accident. The duty of a preceeding motorist not to turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety encompasses the risk that if the turn is made without such observation, a following motorist may not have proper and adequate notice to avoid colliding with the rear of the preceed-ing motorist. LSA-R.S. 32:104. Likewise, the jury may have also determined that plaintiff refused to respect defendant’s obvious intention to turn, or was following too closely without maintaining a proper lookout and control of his vehicle, and the jury could have found that his negligence was also a contributing and/or concurring cause of the accident. We recognize the legal duty of a following motorist to maintain a safe and guarded distance while following. LSA-R.S. 32:81. This duty encompasses the risk of harm from which the plaintiff suffered in this instance, i.e., a rear-end collision. The record contains evidence from which a reasonable fact finder might conclude that plaintiff breached this duty to defendant. The jury may have reasonably found that both plaintiff and defendant breached a legal duty towards each other and that this concurring negligence caused the accident.
Plaintiff argues that he and his witnesses (Krupp and James) gave the most consistent and credible version of the collision and that the jury should have accordingly discounted defendant’s testimony. Plaintiff further argues that defendant’s in court description of the position of the vehicles conflicted with that which the officer asserted was given at the time of the collision.
Appellate courts may not disturb the fact findings of the trier of fact in the absence of manifest error. Arceneanx v. Domingue, 365 So.2d 1330 (La.1979).
*1015 The evidence considered, we find no abuse of discretion in the jury’s determination that both plaintiff and defendant committed acts of negligence which contributed to the accident.
Having found both parties negligent, we turn to the matter of apportionment of fault. In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), the Supreme Court cited the following provision of the Uniform Comparative Fault Act (2)(B) for guidelines in apportioning comparative fault:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
The Supreme Court went on to state that various factors, including the following, may influence the degree of fault assigned to the parties involved:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, or (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. The relationship between the negligent conduct and the harm to the plaintiff is a consideration in determining the relative fault of the parties.
Our consideration of these factors suggests that the fault of the parties is substantially equal. It is apparent that both parties created the hazardous situation, but plaintiff Seaberry apparently either refused to respect defendant’s obvious intention to turn or was following too closely and could not stop in time. Defendant Smith should have known that his left turn could not be done with safety or that plaintiff possibly had inadequate warning of his intention to turn left. Although defendant’s failure to adequately observe whether he could safely turn off of the highway and to adequately warn set the accident in motion, the plaintiff’s failure to respect or observe defendant’s obvious intention to turn had a direct relationship to the accident. We find no extenuating circumstances in either party’s favor which would necessarily excuse his substandard behavior.
After weighing the factors discussed, we apportion fault at 50 percent to plaintiff and 50 percent to defendant Smith.
SUBSEQUENT MEDICAL TREATMENT AND ITS RELATIONSHIP TO THE ACCIDENT
According to the jury verdict, plaintiff did not prove he suffered any accident related injuries. This conclusion we find is clearly wrong.
The testimony of Dr. Joseph Kott, neurosurgeon and plaintiff’s treating physician, indicated that plaintiff was hurt as a result of the accident with defendant Smith. Plaintiff sustained a ruptured lumbar disc at the L-5, S-l interval causing back pain. The ruptured disc compressed a nerve causing nerve root irritation and leg pain. Plaintiff underwent disc surgery to remove the ruptured disc (a discectomy and laminectomy) on January 24,1985. Followup examination showed the disc surgery was successful. However plaintiff’s back pain persisted, though his leg pain was alleviated by the removal of the disc. Plaintiff’s previously absent left ankle reflex transiently returned (though diminished), indicating permanent nerve damage a result of the ruptured disc.
On May 27, 1985 plaintiff was medically discharged by Dr. Kott to return to his prior/ employment as a playground groundskeeper for the city of Kenner. When he failed to do so, he was ultimately fired on August 14, 1985.
Dr. Kott assigned a 10-15 percent functional disability to plaintiff, solely due to the back surgery, with restrictions on repetitive squatting, stooping, and lifting limited to 10-15 pounds. No future surgical intervention was suggested or recommended.
In addition to Dr. Kott, a number of other physicians testified.
*1016 Dr. Morris Fisher, a specialist in occupational medicine, testified that he saw plaintiff, who was sent by his employer, on August 22, 1984 for his complaints of back and leg pain. Dr. Fisher’s examination revealed muscle spasms which were conservatively treated. Plaintiff was referred to Dr. Kott on September 10, 1984 when his back pain persisted.
Dr. Robert Applebaum, a neurosurgeon consulted by Dr. Kott prior to plaintiff’s disc surgery (and by plaintiff about a year later), testified that plaintiff had suffered a ruptured disc and nerve root irritation. Dr. Applebaum assigned to plaintiff a 5-10 percent medical impairment due to the back surgery, with return to any employment he was capable of doing prior to surgery.
In addition, because plaintiff was a patient in potential litigation, Dr. Kott sent him to clinical psychologist, Dr. Thomas Hannie, prior to the disc surgery. Dr. Hannie testified that while he felt plaintiff’s pain had a physical basis, it was also strongly related to his personality problems. Dr. Hannie reported that plaintiff fell into the category of personality types known as “affective pain range,” which he described as a person with serious personality problems and who is highly unlikely to get better if surgery is performed.
In January, 1986, approximately a year post-surgery, plaintiff fell in his shower. Dr. Kott examined him; he found no new injury, only a higher level of pain complaints. Dr. Kott could not form an opinion as to whether the fall reinjured plaintiff’s back. Further examinations of plaintiff by Dr. Kott in July, 1986 and October, 1986 showed a totally normal neurological and straight leg raising test.
In February 18, 1986 plaintiff was committed by parish coroner, Dr. Aris Cox, to the psychiatric unit of Coliseum Medical Center for severe depression and threats against his own life and that of his wife’s. He was released on July 13, 1986. During his stay there, he was again examined by Dr. Applebaum. Dr. Applebaum reported no muscle spasms and minimal limitation of motion, but a positive straight leg raising test and diminished sensation in the left leg indicative of continued nerve root irritation.
Two psychiatrists, Drs. Albert Kay and John Beck (plaintiff's treating psychiatrists at Coliseum Medical Center) testified. In their opinion plaintiff had preexisting emotional problems which were activated by his inability to work, which they assumed was due to his back injury.
In addition, Dr. Charles Smith (plaintiff’s present treating psychiatrist), testified that plaintiff's previous psychological problems were activated by his inability to work, which he also assumed was due to his back injury.
Dr. Aris Cox, a psychiatrist, testified for the defense that plaintiff’s depression was caused by his history of emotional problems activated by his inability to work; however, he found no psychological reason to preclude plaintiff's return to work.
Dr. Russell Grunsten, orthopedic surgeon, examined plaintiff’s back (for the defense) on January 6, 1987 and found no muscle spasm but restricted motion, no motor loss in either extremity, and no sensory deficiency, except for an absent left ankle reflex. Dr. Grunsten did not feel that plaintiff was experiencing any continued nerve root irritation because of his negative straight leg raising test. Dr. Grunsten assigned to plaintiff a 5-10 percent permanent, partial disability to his whole body due to the back surgery. Dr. Grunsten felt that plaintiff could resume his prior employment without lifting restrictions.
In March, 1987 plaintiff drove his automobile into a tree and was hospitalized for broken ribs and a concussion. No new injury, or reinjury, to his back was reported, but his complaints of leg and back pain increased. A repeat myelogram on May 6, 1987 showed no new disc rupture.
Dr. Andrew King, an orthopedic surgeon, performed a lumbo-myelogram and CAT scan on plaintiff on June 4,1987. Dr. King testified that plaintiff’s continued back and leg pain was due to S-l nerve root irritation caused by the previously ruptured disc. Dr. King opined that the disc surgery did not alleviate plaintiff’s leg pain because the back injury made symptomatic a congenital *1017 abnormality (conjoined nerve roots and a sixth vertebrate). We observe that Dr. King formed his opinion without knowledge that plaintiff had been in two accidents since the initial back injury. Dr. King recommended that either plaintiff learn to cope with his pain through a pain clinic or use medication to block the pain.
Plaintiff attempts to show that all of his present physical and emotional problems were related to the 1984 accident with defendant Smith, and refers to various cases in the jurisprudence for the principle that the tortfeasor takes his victim as he finds him, and is responsible for injuries superimposed on existing physical and emotional conditions. Reck v. Stevens, 373 So.2d 498 (La.1979).
Considering all of the medical testimony and evidence, we find that plaintiff has proved by a preponderance of the evidence the causal connection between his ruptured lumbar disc, Mart v. Hill, 505 So.2d 1120 (La.1987), and the accident which is the focus of this suit.
We do not find that plaintiff has successfully proved the accident also resulted in his inability to return to his prior employment on May 27, 1985, or his emotional instability.
As to plaintiffs continued pain complaints, we find it difficult to determine whether the pain is a result of the sued-on accident, or plaintiffs subsequent fall in the shower, or second automobile accident. Nevertheless, we find from the evidence that plaintiff is able to return to his prior type of work with minimal residual impairment. Moreover, we observe as specious, plaintiffs contention that he is unable to work due to great pain, having viewed a videotape taken by a private investigator which shows plaintiff, within a two week period prior to trial, twice changing a tire on his automobile without apparent pain or difficulty in bending, squatting, or lifting.
QUANTUM
Having determined the jury was clearly wrong in its decision that plaintiff suffered no injury as a result of the August 14,1984 accident with defendant Smith, the issue of quantum is before us res nova. Accordingly, we are authorized to make our own determination based upon the evidence contained in the record. Mart v. Hill, 513 So.2d 1235 (La.App. 4 Cir.1987).
Based upon the evidence discussed previously, including that plaintiff suffered a ruptured disc for which he underwent successful surgery (discectomy and lami-nectomy), with a possible 5-15 percent residual impairment and restrictions on repetitive lifting, bending, and squatting, we feel an award of $125,000 is reasonable to recompense plaintiff for past and future pain and suffering. See for instance, Riley v. Winn Dixie Louisiana Inc., 489 So.2d 931 (La.App.Cir. 5 1986), writs denied 494 So.2d 329; Myers v. Ford Motor Co., 486 So.2d 1030 (La.App. 2 Cir.1986); Lofton v. Whimper, 425 So.2d 1307 (La.App. 4 Cir.1983).
As to economic loss, we award $8339,[2] which represents the sum of plaintiffs lost earnings from the date of the accident (August 15, 1984) to the date of his medical discharge to return to his prior employment on May 27, 1985. We do not award an amount for future loss of earnings because of our finding that plaintiff is capable of returning to the same type of work as before the accident with defendant Smith. Similarly, we do not feel an award for future medicals is appropriate, especially in view of the testimony of plaintiffs treating physician that none is anticipated.
Plaintiffs damages based on the awards given, are to be reduced by the 50 percent negligence attributable to him.
In view of our conclusion that plaintiff did suffer some accident related injury for which he is due compensation from the defendant Smith and his insurer Horace Mann Insurance Company, we need not consider the issue of whether the trial court incorrectly allowed Horace Mann Insurance Company to withdraw its $10,000 policy proceeds from the registry of the *1018 court; these proceeds are now subject to plaintiff's claims.
Accordingly, we render judgment in favor of plaintiff Charles Seaberry, and against defendant Jimmy Smith, Horace Mann Insurance Company, and USF & G in the amount of $133,339, less 50% for a total of $66,669.50, plus judicial interest from the date of judicial demand. Further, we render judgment in favor of intervenor, USF & G, for the recovery by preference and priority from plaintiff's award, the amount of $35,058.44 paid by intervenor, USF & G and stipulated into the record, representing medical payments of $15,-745.29 and compensation payments of $19,-313.15. (See LSA-R.S. 23:1103 and Poirrier v. Cajun Insulation, Inc., 501 So.2d 800 (La.App. 4th Cir.1986), writs denied, 502 So.2d 579 (La.1987), reconsideration denied, 503 So.2d 471 (La.1987). We also order that all expert fees and costs of this court and below be apportioned equally between the parties.
JUDGMENT RENDERED.

. USF & G (intervenor below) appears as second appellant in these proceedings and adopts plain *1013 tiff Seaberry’s brief submitting it as its own for purposes of this appeal.

. (1984 lost wages — $3950; 1985 lost wages— $4389)