616 So.2d 1373 (1993)
Buck ZION
v.
Lloyd STOCKFIETH, Chevron Oil Company, and State Farm Mutual Automobile Insurance Company.
No. 91-CA-627.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1993.
*1374 John H. Brooks, Herbert G. Gauthreaux, Gretna, for plaintiff-appellant.
James K. Irvin, Mary L. Grier Holmes, Vinson J. Knight, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, William W. Hall, Hall, Lentini, Mouledoux & Wimberly, Metairie, David L. Duplantier, Chevron U.S.A. Inc., New Orleans, for defendants/cross-appellants Lloyd Stockfieth and Chevron U.S.A. Inc.
Before KLIEBERT, C.J., and GAUDIN and GRISBAUM, JJ.
GAUDIN, Judge.
This is an appeal by both plaintiff Buck Zion and several defendants from an April 25, 1991 judgment of the 24th Judicial District Court which awarded $559,287.00 plus interest to Zion for injuries sustained in a February 9, 1976 two-vehicle accident. Zion argues the sum awarded was not sufficient enough; the defendants, Lloyd Stockfieth and Chevron USA, Inc., contend that the award was far excessive.
For the following reasons, we amend the award to Zion to $153,308.00 for aggravation of preexisting medical conditions resulting in a laminectomy and disability of from two to three years.
The district court award was based on total disability from February 9, 1976, the date of the accident, to February 11, 1989, a 13-year period. The evidence, however, does not support a causal connection between the sued-on accident and a disability period of such extended duration.
Zion's 1974 Ford pickup truck came into contact with Stockfieth's 1976 Ford fourdoor automobile on the Terry Parkway entrance to the West Bank Expressway in Gretna, Louisiana. The accident was Stockfieth's fault. At the Terry Parkway entrance, there are two lanes turning right onto the Expressway. Stockfieth was in the right lane, slightly ahead of Zion who was in the left lane of the two-lane roadway turning right.
As Stockfieth was making his right turn, he saw an auto stalled in his lane. He then veered into the left lane (Zion's lane) where the left front bumper of Stockfieth's car came into contact with the right side of Zion's truck. The investigating police officer estimated both vehicles' speed at five miles per hour.
Zion testified that he was travelling at 25 to 35 miles per hour at impact but this was surely an exaggeration of his speed. Both vehicles stopped at a stop sign prior to turning right and the accident happened just beyond the stop sign.
The investigating officer's report states that damage to both vehicles was slight and that neither vehicle hardly moved forward after they bumped. In the "Distance Travelled After Impact" space on the report, the officer placed a "0" for each vehicle. The officer also said that neither driver reported any personal injuries.
From this seemingly small acorn of an accident, a huge oak tree has grown. Zion argues that his subsequent back surgery, substantial back degeneration and a serious psychological overlay caused by pain are the direct results of the February 9, 1976 accident. He claims to be unemployable.

PERSONAL HISTORY
Zion was born on April 14, 1941. He enlisted in the United States Navy in 1958, six days past his 17th birthday. His naval career was far from distinguished. On March 14, 1959, he was charged with drinking aboard his ship, the USS Merrick; and on March 20, 1959, he was punished for failing to be at his appointed place of duty. In September of 1959, he was again absent from duty without authorization.
In 1960, he had repeated run-ins with civil authorities in Long Beach, California. *1375 At various times he was charged with assault and battery, intoxication, resisting arrest and on suspicion of unauthorized absence from military duty. He was jailed for seven days for traffic violations. On May 4, 1961, a warrant was issued for his arrest.
On August 18, 1961, he was intoxicated and incapacitated and unable to perform his duties aboard his ship. In September of 1961, he was fined in Long Beach for consuming liquor. Released from active service on April 4, 1962, he reenlisted two months later for six years.
He was discharged from the Navy in 1964 as being unfit for active duty. He was assigned a 20 percent disability, 10 percent due to psychological troubles and 10 percent because of a bad back.
In 1959, while aboard the USS Merrick, he was injured when an electrical board in the engine room exploded. This caused, according to Zion, impaired eyesight, severe headaches and aching joints in addition to back pains. Zion told one physician that he was knocked approximately 15 feet and was dazed.
On May 27, 1963, Zion was hospitalized at Pearl Harbor in Hawaii, complaining of back and knee pains. According to clinical records, Zion said that his knees would give way, causing him to fall, and that lumbosacral pains radiated into the posterior aspects of both posterior thighs. The examining doctor, Capt. W.F. Zwilling, however, noted that Zion's complaints were out of proportion to physical findings.
Another Navy doctor, Capt. Jerry J. Embry, in Hawaii reported that Zion complained of dizziness and that he (Zion) couldn't sit long in one position because his back would hurt. This same physician found Zion hostile, sullen and evasive and concluded that Zion was unfit for further military duty because of severe and crippling character and behavior disorders.
In 1968, Zion suffered a back injury while lifting sacks of feed. He was then employed by the Purina Company in Texas.
Zion enlisted in the U.S. Army Reserve in June of 1972. He completed training as a welder and apparently did well in motor maintenance.
In 1973 and 1974, he requested care from the Veterans Administration for back pains. He was hospitalized for several weeks.
On January 25, 1976, while employed as a mechanic at the Naval Air Station in Belle Chasse, Zion was hurt in an automobile accident. He said that he was stopped for a red light when another automobile crashed into the rear of his car. According to a report of injury Zion submitted to the Veterans Administration, he said he "was knocked unconscious."
Between January 25, 1976 and February 9, 1976 (the date of the accident which is now before this Court), Zion fell off of a bulldozer while at the Naval Air Station. According to his foreman, Zion said he had hurt his back so he was sent to sick bay.
Following the February 9, 1976 accident, Zion did not immediately consult a physician. He did see Dr. Homer Kirgis on February 11, 1976. This medical appointment, however, had been scheduled because of injuries sustained on January 25, 1976.

LITIGATION BACKGROUND
Zion filed two lawsuits, one claiming personal injuries from the January 25, 1976 accident and the other claiming personal injuries from the February 9, 1976 accident. The allegations in both petitions were synonymous.
In May of 1978, following back surgery in May of 1977, Zion settled his suit arising from the January 25, 1976 accident for $15,000.00.
The petition for the February 9, 1976 accident was filed on January 6, 1977. The merits were scheduled for trial on November 15, 1978 but this trial date was vacated. On April 9, 1984, the suit was dismissed as abandoned, the dismissal order stating that no steps had been taken in prosecution or defense of the claims between April 4, 1979 and April 5, 1984. On September 14, 1984, Zion filed a motion to set aside the dismissal, alleging that on March 16, 1983, within *1376 the five-year period needed for a valid dismissal, a motion to again set the merits for trial had been sent or hand-delivered by his attorney to the Clerk of Court's office for filing. The motion, however, was not filed and was returned by the clerk because $202.73 in court costs was due.
Zion's motion to reinstate his lawsuit was favorably ruled on. The trial judge, in his "Reasons for Judgment," said:
"At a hearing to set aside said judgment of dismissal, evidence was introduced to show that on March 16, 1983, within the five-year period, counsel for the plaintiff filed with the Clerk of Court a Motion to Set the Case for Trial on the Merits. The Clerk received the motion and marked it `received' but then returned it to the plaintiff on March 16, 1983 with a statement that costs were due and would have to be brought up to date before a filing of the document would be made."
Such action, the trial judge stated, interrupted the five-year period required by LSA-C.C.P. art. 561 for a dismissal. The judgment cited Ellzey v. Employers Mutual Liability Ins. Co., 388 So.2d 843 (La.App. 2 Cir.1980), writ denied at 394 So.2d 617 (La.1980). Ellzey held that two letters by a plaintiff's attorney to the Clerk of Court requesting a trial date, although not placed in the record because a bond for jury costs had not been posted, would preclude a determination of abandonment under Art. 561.
Here, Zion's attorney's letter was not filed. It was returned and not quickly acted on, i.e., Zion's attorney did not return the motion with a check for the overdue court costs. In fact, no step was taken on Zion's behalf until the motion to vacate the dismissal was filed.
Stockfieth and Chevron, relying on Chevron Oil Co. v. Traigle, 436 So.2d 530 (La.1983), and cases cited therein, argue that the judgment setting aside the dismissal was in error because the attorney's letter was neither formally filed nor did it appear in the record. This is a strong argument, considering the Louisiana Supreme Court's wording at page 532. Nonetheless, we cannot say the trial judge was wrong in considering Zion's attorney's motion a step in the prosecution of this case. There is no exact precedent case. In Chevron Oil Co. v. Traigle, supra, the Court said that while motions to substitute counsel and correspondence filed in the record were not steps in the prosecution of a case, the filing of answers to interrogations was a step within Art. 561 meaning.
The reinstatement judgment cleared the way for the case to be tried on its merits.

FIRST TRIAL
This was held on November 13, 1985, almost 10 years after the sued-on accident. Liability was not a serious issue. Zion was found not to be at fault and permitted to recover damages. Zion was not working on February 9, 1976; instead, he was on an errand for his church in a borrowed pickup truck.
The trial judge awarded $911,169.80, basing this award on Zion's testimony, the medical testimony of Drs. Homer Kirgis and Kenneth Adatto and on medical reports and records from the Veterans Administration Hospital in Albuquerque, New Mexico.
Zion saw Dr. Kirgis at Ochsner Clinic on February 11, 1976, two days after the Terry Parkway accident. This appointment had been scheduled prior to February 9th. According to Dr. Kirgis, Zion had returned to work on February 4th but his discomfort for the January 25th accident "was so great" that Zion had stopped working on February 6th.
Dr. Kirgis stated that Zion told him that the first injury, from the January 25th accident, was more severe than that from the second accident.
On February 11th and for a month thereafter, Dr. Kirgis found severe spasm of the cervical paraspinous muscles and marked restriction of the head and neck. Dr. Kirgis prescribed the application of heat and mild analgesics and concluded that "... prognosis should be favorable, but he is to report back if his symptoms persist."
Apparently Zion's symptoms did persist and he was referred to Dr. Adatto, an orthopedist in August, 1976. In May, 1977, *1377 Dr. Adatto performed a laminectomy, removing a portion of one of the lamina of Zion's back at the L-5, S-1 level.
Dr. Adatto saw Zion on various dates, the significant dates being:

August 5, 1976Dr. Adatto's first impression was that Zion had "a bruising reaction to the entire spine" which usually lasted six to eight weeks.

September 9, 1976Zion was "doing much better". Dr. Adatto recommended an exercise program.

October 11, 1976Zion was improved but not as much as Dr. Adatto hoped. A brace (lumbosacral corset) was ordered.

October 26, 1976This was a special examination ordered at the request of the United States Navy. Zion had been employed as a mechanic at the Naval Air Station at the time of the February 9, 1976 accident and for approximately a year prior to that time. Dr. Adatto said that he advised the Navy that Zion should not do any stooping or bending and that he should not lift anything over 45 pounds.
December 6, 1976Zion's symptoms still present.

January 3, 1977Same as December 6th. In late January, a myelogram was attempted but it was not successful. On May 3, 1977, another myelogram was performed and it showed, according to Dr. Adatto, a defect at L-5, S-1.

May 6, 1977Surgery performed. Dr. Adatto said Zion had a routine recovery.

May 13, 1977Zion doing very well, only minimal leg pain.
June 15, 1977Zion "doing okay," Dr. Adatto said.

July 14, 1977Although Zion complained of "a little right leg pain", Dr. Adatto told him that he could return to light duty.

September 8, 1977Zion had "some leg pain" but was "doing fine," Dr. Adatto stated.

November 10, 1977Dr. Adatto said that while Zion complained of pain and discomfort, he (Zion) was "overall improved" and contemplating electronics school.

February 2, 1978Dr. Adatto said that Zion was "under relative control." This was the last time Dr. Adatto saw Zion.
Dr. Adatto did point out several times in his testimony that Zion had preexisting arthritis and other preexisting back troubles.
Following surgery in May, 1977, Zion returned to his original home in Portales, New Mexico and was residing there at the time of the first trial. He had been examined and treated by various doctors at the Veterans Administration Hospital. These voluminous records were admitted, apparently without objection, after trial testimony had been concluded and the case submitted for adjudication.
These records indicated that for several years Zion had complained of headaches, rashes, bulging eyes, urinary and kidney problems, blackouts and dizziness, chest pains, ringing in his ears, foot problems, partial paralysis, etc. Apparently, the physicians there could find no objective reasons for most of these complaints despite various tests and scans. Zion's problems were mostly if not all psychological. In any event, it appears from these records that Zion's complaints and persisting efforts to obtain treatment in New Mexico were related to his attempts to qualify for a higher disability level.
Also, the records show a violent and hostile nature. Once when Zion felt that he wasn't receiving adequate and effective treatment and when a treating doctor wanted to stop prescribing pain-killing drugs, Zion threatened to kill that physician and other hospital personnel.
Also submitted after trial was a deposition of Dr. Irving Redler, an orthopedist who had examined Zion in May, 1979. Dr. Redler said that Zion had a 10 percent disability but that he was capable of returning to his former employment. Dr. Redler could find no evidence of functional impairment or residual disability involving the neck or spine attributable to the February 9, 1976 automobile accident.
The trial judge found that by January, 1982, after prolonged treatment, Zion's condition *1378 was diagnosed as chronic pain syndrome, caused by excessive pain and a psychological reaction to that pain. The trial judge related all of Zion's back pain and psychiatric and nervous disorders to the February 9, 1976 accident.
The trial judge's award, which was more than asked for by Zion, included:

$420,000.00 - general damages,
 130,000.00 - loss of income,
 228,196.80 - loss of future income,
 27,703.00 - medical expenses, and
 105,270.00 - future medical expenses

For reasons not now relevant, this case was ordered retried in the 24th Judicial District Court.

SECOND TRIAL
This trial, held on October 11, 1990, started with the plaintiff, in accordance with LSA-C.C.P. art. 1978, standing on the record of the first trial. Art. 1978 reads:
"It shall not be necessary in a non-jury trial to resummon the witnesses or to hear them anew at a new trial if their testimony has once been reduced to writing, but all such testimony and evidence received on the former trial shall be considered as already in evidence. Any party may call new witnesses or offer additional evidence, and with the permission of the court recall any witness for further examination or cross-examination as the case may be. However, the parties shall not be precluded from producing new proofs, on the ground they have not been offered on the first trial. When a new trial is granted for reargument only, no evidence shall be adduced."
The defense called Dr. Richard Roniger and two witnesses who did surveillance work in New Mexico. Zion testified as a rebuttal witness, as did James Childs, who qualified as an expert in the changing of automobile tires and in the maintenance of heavy equipment.
Also submitted were the depositions of Dr. G. Germon Brown, Jr., taken on December 11, 1985, and Lloyd Robichaux, Zion's foreman at the Naval Air Station. Robichaux described Zion's fall from the bulldozer.
Dr. Roniger, a psychiatrist, examined Zion on December 20, 1988 after reviewing numerous records pertaining to Zion, including Dr. Adatto's in-court testimony, Zion's military records and the Albuquerque medical records. Dr. Roniger found Zion "robust and healthy" physically but said that Zion had an antisocial personality disorder that had nothing to do with any trauma or accident. Dr. Roniger said:
"A personality disorder is a chronic lifetime maladaptive pattern of behavior. And in this instance, his antisocial features, meaning that these peoplethis man, and people who have their diagnosis, do not conform to the rules, to the rules of society, they make their own rules, they change them, they adjust them to meet their own needs. They do not find themselves aligned with other people. Because of that they find themselves on the outside. They want what they want when they want it and they make demands, are easily frustrated and angered, compulsive substance abusers, alcohol substance abusers, outcasts."
When he saw Dr. Roniger, Zion was taking a large quantity of prescription drugs, including 300 valium and 270 doxepin tablets a month. Dr. Roniger felt that Zion was addicted to these prescription drugs.
Dr. Roniger was asked if, in his opinion, there was any relationship between Zion's present condition and any automobile accident that occurred in 1976. Dr. Roniger replied:
"No. I think this man's presentation with me in the office was exaggerated, was exaggerated through the 1980s in the VA records that I saw, was exaggerated in the military and I think his presentation throughout, according to the records that I've seen, and with me, was one of exaggeration that has nothing to do with an accident in 1976."
*1379 The second defense witness was Bob Dodgin, a retired New Mexico state policeman, who said that he had observed Zion eight or nine times in Portales, New Mexico since November, 1988 after being retained to do a surveillance. Dodgin said that Zion walked and did other things normally, without any limp, and that he never saw Zion with a back brace or any other kind of support apparatus.
The third defense witness was Donald Roberts, a private investigator hired by Chevron in November, 1988. On February 11 and 13, 1989, Roberts took movies of Zion using a video camera (camcorder). The film showed a man Roberts identified as Zion attempting to mount a truck tire and performing other physical tasks without any visible braces and without difficulty.
When Zion testified in rebuttal, he admitted that he was the man in part of the film but he said that the person in the second segment of the tape could have been one of his two brothers.
Zion said that he was wearing braces under his jeans in the portion of the video he admitted being in. He also said that he was a commercial pilot and that he had served as assistant superintendent in the rebuilding of Fort Hood, Texas, allegations without support anywhere in the record.
Childs viewed the Roberts video and noted that, in his opinion, Zion walked slowly and used improper tire-changing techniques. Childs said that Zion "... was either lazy or didn't know what he was doing."
Dr. Brown, an orthopedist, saw Zion on November 14, 1985. On that date, Zion was using Canadian crutches and a back brace although Dr. Brown's examination disclosed no medical reason for these supporting devices.
Dr. Brown said that Zion has advanced degenerative disc disease in the spine and that he (Zion) complained of pain. Dr. Brown found Zion unemployable partially because of his back but primarily because of his psychological problems. Dr. Brown could not relate any of Zion's troubles, physical or mental, to the February 9, 1976 accident.
In response to questions by Zion's counsel, Dr. Brown stated that a "... chronic pain syndrome is an extremely complicated, complex condition ..." and that, in many cases, it is a deep-seated psychiatric problem. The syndrome, real or imagined, involves an appreciation of pain, Dr. Brown said.
Also in evidence, for the trial judge's consideration, was a report by Dr. Charles Edward Moan, a psychologist who saw Zion on December 9, 1976 at the request of Dr. Adatto. Dr. Moan's impression was that Zion was suffering from a conversion reaction and neurosis. Dr. Moan wrote:
"Testing reveals this to be a strikingly immature, self-centered, and demanding individual who will be found to be basically quite dependent and complaining and to be inclined to exploit his interpersonal relationships, for egocentric gains. He is a gregarious, shallow, and unusually superficial person who lacks sincere involvements with other people and who will have temporary acquaintances and comradeships which he can easily set aside when he finds them no longer novel, stimulating, or gratifying. He wants immediate and constant reward and reinforcement and will be impatient, hostile, and quickly frustrated when he is deprived, has to wait or is outdone by someone else. He is given to excessive complaining about and preoccupations with somatic symptoms which fundamentally represent emotional conflicts in his life which he is too inadequate or ineffectual to more effectively manage and accommodate. Moreover, the utilization of physical variables affords him not only the opportunity to deny difficulties in his life which he cannot handle but also allows him marked secondary gains and rewards. He will clearly prefer a medical explanation of his problems and will reject psychological interpretations and inquiry. His insight into the motivations of his attitudes and behaviors and into his dynamics will characteristically be exceptionally limited. Prognosis for psychiatric/psychological treatment is notably poor, as he will resent and resist *1380 such and will in no way accept giving up the very symptoms which tend to accrue him much gratification and opportunity to excuse himself from obligations and responsibilities. If depression occurs in him, such is likely to be of short duration and expressed by tearfulness and emotional liability rather than by a sustained despondent mood and self-depreciatory trends."
The trial judge found that Zion had sustained serious injuries in the February 9, 1976 accident but that he had recovered by February 11, 1989 and at that time was capable of full time employment. The $559,287.00 award is thusly itemized:

$350,000.00 - general damages
 181,584.00 - lost wages; and
 27,703.00 - medical expenses.

By citing February 11, 1989 as the date of recovery, the trial judge no doubt was impressed by Roberts' videotape.

APPELLATE REVIEW
The test for determining a causal relationship between a plaintiff's injuries and subsequent physical and/or mental problems is whether he or she proved by medical testimony that it was more probable than not that later troubles were caused by the accident. See Mart v. Hill, 505 So.2d 1120 (La.1987). A reviewing court should not upset trial court factual findings unless there was manifest error. Here, we find such error in the findings, by both the first and second trial judges, that, more probable than not, there was a causal connection between the relatively mild February 9, 1976 accident and any of Zion's symptoms much beyond February 2, 1978, the last time Zion was seen by Dr. Adatto. Likewise, it was clearly wrong to blame all of Zion's problems, physical and psychological, on the February 2, 1976 accident.
In Dr. Adatto's letter to Zion's attorney dated March 10, 1976, he (Dr. Adatto) wrote that Zion said that his neck and back complaints were related to the January 25, 1976 accident. There was no mention of the February 9, 1976 accident, although Dr. Adatto, when he testified during the first trial, said that possibly Zion could have also mentioned the February 9th date and that this was "... lost in the transfer of that information."
There are several hundred pages of records and documents from New Mexico but not a single entry seriously suggests that any of Zion's multiple and lingering complaints, from dizziness to backaches to malfunctioning kidneys to ingrown toenails, was related to or the result of the February 9, 1976 accident. No medical person from Albuquerque was called as a witness during either trial and none was deposed, at least there aren't any such depositions in evidence.
Proof to substantiate a claim for damages must be clear and definite and not subject to conjecture. See Burton v. Jardell, 589 So.2d 610 (La.App. 2 Cir.1991), and many other cases with a similar holding. When there is a lack of evidence supporting an award, or where the evidence mitigates against such an award, the appellate court should act appropriately.
Zion's records indicate that factors other than the February 9, 1976 accident caused his problems. On one document in evidence, a questionnaire dated June 13, 1977 and filled in and signed by Zion, he answered one of the questions by writing in: "Back injury, A.A., Jan. 1976 and 1963." We assume "A.A." stands for automobile accident and "1963" refers to the time he was hospitalized in Hawaii while in the Navy.
In October, 1985, Zion was examined in New Mexico by psychologist Dr. Seymour Epstein, who wrote:
"There is a strong clinical suspicion that Mr. Zion spends much thought and energy on making demands upon support agencies toward maximizing benefits. He talks about being a victim of agent orange and napalm experimentation, and is planning to get an attorney involved in his case."
Actually, Zion in New Mexico, again and again, tried to convince Veterans Administration doctors and officials that he had a service-connected problem so that his disability percentage could be raised. He was not trying to relate any symptom to a 1976 *1381 vehicular accident in Louisiana. On the other hand, many of the New Mexico physicians were advised of the Louisiana accidents yet not one said or even hinted that the February 9, 1976 accident was the cause or a contributing cause of Zion's ills. From the VA records, it would appear that many of Zion's complaints led to and were treated by prescription drugs.
Although there is no medical correlation between the February 9, 1976 accident and Zion's New Mexico complaints, we are aware that the first trial judge found Zion to be a believable witness and that the second trial judge, the one whose judgment is now at issue, accepted part of Zion's testimony. Accordingly, Zion is entitled to some damages. In reducing an award, an appellate court can only lower the award to the highest amount reasonably within the trial judge's discretion. See American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429 (La.1991).
Zion was not asymptomatic when his vehicle and Stockfieth's bumped. Carefully considering all of the testimony and evidence, a trial judge could have found, within the range of reasonable discretion most favorable to Zion, that the February 9, 1976 accident contributed to some modest degree to his back troubles and to the need for the May, 1977 laminectomy. With regard to the aggravation of Zion's mental problems, there is no compelling medical testimony one way or the other. In fact, it wasn't easy for Zion to connect the laminectomy to the February 9, 1976 accident. During the first trial, Dr. Adatto was asked several hypothetical questions, including one by the trial judge. Chevron and Stockfieth do not believe that any of the hypothetical questions fully detailed Zion's history.
The record does strongly indicate that a trier of fact could well have found Zion not nearly as believable as he was determined to be in district court. Zion's entire history, military and medical, is one of repeated overstatements and misrepresentations. We did not, however, either see or hear Zion; accordingly, giving credence to the second trial judge's partial finding of credibility, we are compelled to affirm an award equal to Zion's established damages during a two- or three-year period following the February 9, 1976 accident. The April 25, 1991 judgment made awards for (a) past medical expenses, (b) lost wages and (c) general damages.
The sum of $27,703.00 was awarded for past medical expenses. This apparently included $26,164.00 owed to the Veterans Administration Hospital in New Mexico. For reasons already stated, none of these charges can be connected to the February 9, 1976 accident. Dr. Adatto's total bill was $1,738.00; in addition, there were hospital charges for the laminectomy.
Chevron suggests in its brief that Dr. Adatto's bill and related hospital charges could have been included in the settlement for the January 25, 1976 accident. Regardless, evidence in this record does not show or imply that treatment and surgery for the aggravation caused by the February 9, 1976 accident could have exceeded $10,000.00. In any event, the record does not show that Zion paid any bill, other than perhaps Dr. Adatto's bill, or that he could now be required to pay any other medical bill, including those incurred in New Mexico.
Regarding lost wages, Zion was awarded $181,584.00 in the second judgment based on lost U.S. Navy wages of $234.00 per week and part-time U.S. Air Force wages of $150.00 per month from February, 1976 to February, 1989, a 13-year span. Lost wages for a three-year period would be $43,308.00 ($234.00 multiplied by 4.5 equals $1,053.00 plus $150.00 is $1,203.00 per month multiplied by 36).
For general damages, pain and suffering, the trial judge awarded $350,000.00, $70,000.00 less than the sum awarded after the first trial. In Louisiana, reported awards for aggravation of back conditions resulting in disc surgery range from $10,000.00 to much higher figures. The Fourth Circuit has stated at least twice, in Redondo v. Consol. Freightways, 529 So.2d 1296 (La.App. 4 Cir.1988), writs denied at 533 So.2d 363 (La.1988), and in Buras v. United Gas Pipeline Co., 598 So.2d 397 (La.App. *1382 4 Cir.1992), writs denied at 605 So.2d 1147 (La.1992), that the very minimum general damages award for a herniated disc requiring surgery was $100,000.00.
Awards in excess of $100,000.00 have been made in some cases involving, along with other factors, back injuries and disc surgery. In Valentine v. Wells, 540 So.2d 344 (La.App. 2 Cir.1988), writs denied at 546 So.2d 178 (La.1989), cited by Zion, approximately $350,000.00 was awarded for pain, suffering, mental and emotional anguish and loss of consortium to a dependable, hard-working machinist who was, unlike Zion, in very good health before being injured. Further, all of the medical testimony related the petitioner's problems to a violent automobile accident. The plaintiff's vehicle was struck in the rear by a dump truck and knocked into a parked car and then struck again by the dump truck.
In Landry v. Melancon, 558 So.2d 1143 (La.App. 1 Cir.1989), also cited by Zion, an in globo award of $734,000.00 was given to a 35-year-old woman who suffered three herniated discs, chronic pain syndrome with depression and who was left permanently unable to compete in the labor market. The lump sum award was not itemized either in the trial court or on appeal by the First Circuit but it did include a minimum of $148,656.00 in lost wages and about $80,000.00 in past and future medical expenses. This woman, according to the testimony of her family physician, Dr. Robert Blereau, was asymptomatic before her accident. Dr. Blereau said that there was no question, medically speaking, that the petitioner's symptoms were secondary to her accident. Zion was neither asymptomatic on February 9, 1976 nor was he the beneficiary of any medical testimony causally relating his February 9, 1976 accident to any treatment much past his final visit to Dr. Adatto's office.
In Lewis v. Macke Bldg. Services, Inc., 524 So.2d 16 (La.App. 5 Cir.1988), writs denied at 532 So.2d 131 (1988), this Court lowered an award for general damages for back injuries involving several surgical procedures from $525,000.00 to $125,000.00. In Seaberry v. Smith, 527 So.2d 1011 (La.App. 5 Cir.1988), writs applied for but not on the issue of damage, the sum of $125,000.00 was awarded to a plaintiff who had a laminectomy and who had a possible five to 15 per cent permanent impairment. The issue of quantum was before this Court res nova, the trial court having found no injury as a result of a minor impact accident.
It would appear, from these and other cases, that the discretionary range for general damages for aggravation of a back condition contributing to some degree to disc surgery would not exceed $100,000.00.
For these reasons, we amend the award to Zion to $153,308.00, which includes $100,000.00 for general damages, $10,000.00 for medical expenses and $43,308.00 for lost income. Zion is also entitled to legal interest from date of judicial demand until paid.
AMENDED AND, AS AMENDED, AFFIRMED.
KLIEBERT, C.J., concurs.
KLIEBERT, Chief Judge, concurring.
I concur in the results reached by the majority opinion, but not necessarily for the reasons stated by the majority opinion.